**NOT RECOMMENDED FOR PUBLICATION**
File Name: 18a0565n.06

No. 17-2369

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| KEVIN KEOGH, | ) | |
| | ) | **FILED** |
| Plaintiff-Appellant, | ) | Nov 08, 2018 |
| | ) | DEBORAH S. HUNT, Clerk |
| v. | ) | |
| | ) | |
| CONCENTRA HEALTH SERVICES, INCORPORATED, | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN |
| | ) | |
| | ) | |
| Defendant-Appellee, | ) | |
| | ) | |
| SUBURBAN OCCUPATIONAL HEALTH, | ) | |
| | ) | |
| Defendant. | ) | |

BEFORE: GRIFFIN and DONALD, Circuit Judges; BERTELSMAN, District Judge.[*]

GRIFFIN, Circuit Judge.

Plaintiff, Dr. Kevin Keogh, appeals the district court's grant of summary judgment in favor of defendant Concentra Health Services, Inc.,[1] on his Family and Medical Leave Act (FMLA) and Americans with Disabilities Act (ADA) claims.[2] For the reasons that follow, we affirm.

I.

Plaintiff is a doctor of occupational medicine who has been employed by Concentra—and its various predecessors—since selling his medical practice to Concentra in 1993. Defendant

---

[*]The Honorable William O. Bertelsman, United States District Judge for the Eastern District of Kentucky, sitting by designation.

[1]Defendant was previously misnamed in plaintiff's complaint as "Concentra Corporation."

[2]While the lower court docket lists numerous defendants, we use "defendant" to refer solely to Concentra, as the others are not parties to this appeal.

offers patients occupational health services through its numerous centers, with plaintiff working primarily out of its Livonia, Michigan location during the final years of his employment. Plaintiff served as a "staff physician" before being promoted to "center medical director," an administrator position for their Livonia center, in 2001.

Dr. Keogh's responsibilities included patient medical care and management of the Livonia center. Management duties included staffing decisions, executing Concentra's strategy, and making sure all employees at the center follow the company's "playbook." The playbook provides uniform rules and procedures for Concentra's operations, medical care, therapy care, customer experience, and sales and marketing. During his employment, plaintiff signed agreements explicitly providing that he would follow Concentra's rules and playbook.

In mid-2013, Dr. Linda Thomas became Concentra's "area medical director" for the region encompassing the Livonia center. Dr. Thomas (and other supervisors) described plaintiff as an excellent diagnostician and took no issue with the number of patients he was able to care for in the clinic or the quality of his patient care. Beginning in 2014, however, Dr. Thomas began to have concerns with plaintiff's behavior and performance as leader of the Livonia clinic. In February of 2014, for example, Dr. Keogh told her that, though he was available, he had no interest in attending a mandatory quarterly meeting for all center directors at the Livonia location, and denigrated Concentra's playbook. When again confronted by Dr. Thomas about the mandatory nature of the meeting, he told her that he would not attend, before laughing at Dr. Thomas's concerns and stating, "what are you going to do, fire me?" Ultimately, plaintiff did show up, but only after missing the first 70 minutes of the 90-minute meeting because he was dictating in a separate room. And throughout the meeting Dr. Keogh was defiant and argumentative, as well as wholly uninterested in following through with Concentra's universal policies. The purpose of the meeting

was to "rollout" the new Concentra playbook, but, instead of supporting Concentra's efforts, plaintiff was disrespectful and obstinate.

After this meeting, Dr. Thomas asked plaintiff to sign his copy of Concentra's "playbook pledge"—a pledge in which plaintiff would agree to adhere to the principles in the playbook. Instead, and in front of a number of his subordinates, he crossed out certain things he disagreed with in the pledge and signed it "Wiley E. Coyote [sic]." After explaining that the signed pledge would be posted in the center and that plaintiff should be an example for his staff, Dr. Thomas asked him to sign a clean copy, but he refused. Instead, he merely signed his initials next to the joke signature.

Dr. Thomas informed her supervisor, regional medical director Dr. Janet Cobb, of plaintiff's behavior. Dr. Cobb forwarded the information to Concentra's HR representative, Thomas Tschirhart, and Dr. Raad Yaldo, Concentra's vice president of medical operations; explained that plaintiff "blatantly resist[ed] [Concentra's] values"; and reported that plaintiff would receive a "performance improvement plan" or "PIP." Though Dr. Cobb stated she would take part in the meeting and PIP, she also noted that she believed plaintiff was unlikely to change his behavior, plaintiff was "beyond PIP at this point," and she was "in full support of making a move to separate Dr. Keough [sic]."

The following week, plaintiff met with Drs. Cobb and Thomas, at which point he received his 30-day PIP. The PIP listed a number of plaintiff's conduct and work performance problems, including: openly mocking Concentra's policies and procedures; failing to complete his patient charts within the 24-hour deadline; failing to participate in grievance, coaching, or disciplinary actions for his staff; and displaying unprofessional demeanor, including "walk[ing] in late, while a presentation was in progress and announc[ing] 'Hi Ladies and Genitals.'" The PIP required that

plaintiff fix all the listed deficiencies in 30 days, and that he cease undermining any of Concentra's policies or initiatives.

During the 30-day duration of the PIP, plaintiff declined to see a patient who arrived at 4:45 p.m.—fifteen minutes before the end of plaintiff's shift—for a physical examination, even though Concentra policy required him to see any patients who arrived before 5:00 p.m. On another occasion, a patient arrived at the Livonia center at 8:10 a.m.—the center opened at 8:00 a.m.— with a work-related laceration to his hand. Unfortunately, plaintiff was late and did not arrive at the center until 8:35 a.m., but the patient's injury was serious enough that center staff called for emergency medical services. At the conclusion of the 30-day PIP, plaintiff underwent a review of his work and it was determined that plaintiff had not completed any of the goals, though it was noted that "Dr. Keogh takes excellent care of his patients." The PIP was extended for another 30 days. At the second 30-day review, plaintiff showed some improvement. While plaintiff was completing his patient charts on time and had improved his leadership at the Livonia center, he still failed to attend all clinician meetings and failed to complete audits of the center's efficiency. At this time, Dr. Thomas decided to end the PIP because her only other option was to put plaintiff on a final warning.

In the next month, plaintiff failed to complete two mandatory training modules, despite being warned by Dr. Thomas that his failure to do so would cause him to be removed from the work schedule. Dr. Thomas subsequently emailed Drs. Cobb and Yaldo to request permission to demote plaintiff from center medical director to a float physician. When Dr. Cobb agreed, Dr. Thomas then demoted plaintiff to float physician, removing all administrative duties, on August 11, 2014.

The problems did not cease after plaintiff's demotion. On August 27, 2014, Dr. Thomas observed the Livonia center and had numerous concerns with plaintiff's behavior. In particular, Dr. Thomas relayed to Drs. Cobb and Yaldo, as well as Tschirhart, that plaintiff was routinely sarcastic and disrespectful to staff; refused to do tasks that he felt were no longer his responsibility as a float physician; actively impeded other staff who were trying to follow Concentra's policies; stated in front of staff that he believed Concentra's policy changes over the past thirty years were negative; and failed to show up on time, arriving at least thirty minutes late every day that week. Dr. Thomas told plaintiff he had to be at work on time every day and that he must perform his duties in a respectful and professional manner. Nevertheless, the very next day plaintiff arrived for work over an hour after his scheduled shift began, without excuse and without letting his coworkers know he would be late. Dr. Thomas gave plaintiff a final warning and reiterated the requirements that he be at work on time, avoid any outbursts, be respectful, and cease making derogatory remarks about Concentra. The following week, plaintiff was late for work twice, once claiming he forgot his work clothes after going to the gym, and the other time giving no excuse at all. Furthermore, Dr. Thomas received reports that plaintiff had been leaving work over an hour before his shift ended, multiple times. Because plaintiff violated his final warning, Drs. Cobb, Yaldo, and Thomas, and Tschirhart all agreed to meet to formally decide whether to fire plaintiff.

Around this time, in late August and early September 2014, plaintiff began to look into FMLA leave for his back.[3] He claims to have mentioned the possibility of FMLA leave or an ADA accommodation to Dr. Thomas during an argument between the two on August 23rd, though he admitted he was not specific with his preference. In early September, he reached out to

---

[3]From 2010-13, plaintiff took various leaves for issues relating to his spinal fusion and herniated disc surgeries. Those leaves are not at issue in this lawsuit.

Tschirhart about the possibility of leave, but characterized his actions as "still investigating" whether to take FMLA leave at this time. In particular, plaintiff was interested in changing his shift hours to leave one hour early, and to have a standing work desk so he would not need to sit during the workday, which aggravated his back. Plaintiff did note, however, that the Concentra locations he worked at already offered standing workstations. According to plaintiff, Tschirhart told him to "sit tight" while Concentra looked into it. Plaintiff never contacted Concentra's third-party FMLA vendor, as required by its FMLA policy, even though he knew he was supposed to do so.

At a meeting on September 12, 2014, defendant gave plaintiff written notice of termination of his employment due to his tardiness and conduct issues. During the meeting, which was attended by Drs. Thomas, Cobb, and Yaldo, Tschirhart, and Concentra's president Dr. Tom Fogerty, the parties briefly mentioned plaintiff's previous interest in standing desks and an eight-hour workday.

After exhausting his administrative remedies, plaintiff filed this lawsuit, alleging that defendant violated his rights under the FMLA and ADA. Defendant moved for summary judgment after discovery, which the district court granted. The court held that plaintiff himself only ever characterized his actions as "'investigating' the possibility of taking FMLA leave" and, therefore, he could not show that he adequately provided defendant notice of his intent to take FMLA leave. And even if he could make out a prima facie case under the FMLA, the court held that he failed to rebut Concentra's legitimate basis for terminating his employment. Plaintiff's ADA discrimination and retaliation claims were similarly unsuccessful; the district court held that he could not support the "but for" causation requirement under the ADA. Finally, the court granted

defendant summary judgment on plaintiff's failure-to-accommodate claim under the ADA because he failed to unequivocally request an accommodation.

Plaintiff now appeals.

II.

We review the district court's grant of summary judgment de novo. *Bormuth v. Cty. of Jackson*, 870 F.3d 494, 503 (6th Cir. 2017) (en banc). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "To prevail, the nonmovant must show sufficient evidence to create a genuine issue of material fact, which is to say, there must be evidence on which the jury could reasonably find for the nonmovant." *Sumpter v. Wayne Cty.*, 868 F.3d 473, 480 (6th Cir. 2017) (internal quotation marks and brackets omitted). All evidence and inferences therefrom must be viewed in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

III.

Plaintiff first argues that the district court erred in granting defendant summary judgment on his two FMLA claims. We address each in turn.

The FMLA "entitles employees to an annual total of twelve weeks of leave for a number of reasons including, inter alia, because of a serious health condition that makes the employee unable to perform the functions of the position of such employee," *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 281 (6th Cir. 2012) (internal quotation marks omitted), and, when medically necessary, such leave may be taken intermittently, *Tillman v. Ohio Bell Tel. Co.*, 545 F. App'x 340, 348 (6th Cir. 2013) (per curiam) (citing 29 U.S.C. § 2612(b)(1)). The FMLA makes it unlawful for any employer "to interfere with, restrain, or deny the exercise of or the attempt to

exercise, any right provided [by the Act]," 29 U.S.C. § 2615(a)(1), or to "discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by [the Act]." § 2615(a)(2).

As we have noted, §§ 2615(a)(1) and (2) constitute two separate theories of recovery under the FMLA, with different proofs for each. *Seeger*, 681 F.3d at 282. Section 2615(a)(1) encompasses the "interference" theory, under which, "[i]f an employer interferes with the FMLA-created right to medical leave or to reinstatement following the leave, a violation has occurred," regardless of intent. *Arban v. W. Pub. Corp.*, 345 F.3d 390, 401 (6th Cir. 2003). The question in a "retaliation" theory claim under § 2615(a)(2) is "whether the employer took the adverse action because of a prohibited reason or for a legitimate nondiscriminatory reason." *Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 508 (6th Cir. 2006) (citation omitted). A claim of retaliatory discharge is cognizable under both theories, *Seeger*, 681 F.3d at 282, and plaintiff alleged them in the alternative. Plaintiff's claims are based upon circumstantial evidence, so the familiar *McDonnell Douglas* burden-shifting framework applies. *Id.* at 283.

### A.

We first address plaintiff's claims under the "interference" theory. To establish a prima facie case, plaintiff must show that: "(1) []he was an eligible employee, (2) the defendant was an employer as defined under the FMLA, (3) []he was entitled to leave under the FMLA, (4) []he gave the employer notice of [his] intention to take leave, and (5) the employer denied the employee FMLA benefits to which []he was entitled." *Grace v. USCAR*, 521 F.3d 655, 669 (6th Cir. 2008).

"To invoke the protection of the FMLA, an employee must provide notice and a qualifying reason for requesting the leave." *Wallace v. FedEx Corp.*, 764 F.3d 571, 586 (6th Cir. 2014) (brackets omitted). "When an employee seeks leave for the first time for a FMLA-qualifying

reason, the employee need not expressly assert rights under the FMLA or even mention the FMLA." 29 C.F.R. § 825.303(b). Instead, the FMLA only requires the employee to "provide sufficient information for an employer to reasonably determine whether the FMLA may apply to the leave request." *Id*. "The employee's burden is not heavy." *Wallace*, 764 F.3d at 586. Rather, it is the employer who bears the burden of obtaining any additional information that may be needed to establish eligibility. 29 C.F.R. § 825.303(b). But the notice requirement must generally include some "indication of 'the anticipated timing and duration of the leave.'" *Wallace*, 764 F.3d at 586 (quoting 29 C.F.R. § 825.302(c)). And "[a]n employer may require an employee to comply with the employer's usual and customary notice and procedural requirements for requesting leave, absent unusual circumstances. For example, an employer may require that written notice set forth the reasons for the requested leave, the anticipated duration of the leave, and the anticipated start of the leave." 29 C.F.R. § 825.302(d).

Here, plaintiff's own testimony thwarts his FMLA claim. By his own words, plaintiff never passed the "investigating" stage regarding any FMLA request. There is no evidence in the record that plaintiff ever actually requested intermittent leave, even accepting that no specific language is necessary. 29 C.F.R. § 825.303(b). Mere questions about possible leave and adjustment of working hours, without other information alerting Concentra to plaintiff's possible intent to take such leave, are insufficient. *See Walton v. Ford Motor Co.*, 424 F.3d 481, 486 (6th Cir. 2005). Not only did Dr. Keogh fail to "provide sufficient information for an employer to reasonably determine whether the FMLA may apply to the leave request," 29 C.F.R. § 825.303(b), he failed to provide enough information for Concentra to know there was any such *request* at all. And plaintiff admitted he knew that he must address all FMLA requests to Concentra's third-party FMLA vendor to comply with FMLA notice requirements, but did not. *See* 29 C.F.R. § 825.302(d)

("An employer may require an employee to comply with the employer's usual and customary notice and procedural requirements for requesting leave, absent unusual circumstances.). On this basis, we agree with the district court that plaintiff failed to raise a genuine issue of material fact on his FMLA interference claim sufficient to survive summary judgment.

Furthermore, and even if plaintiff established a prima facie case of FMLA interference, we agree with the district court that he failed to show that defendant's legitimate basis for terminating his employment was merely pretext for discrimination. *See Grace*, 521 F.3d at 670; *Donald v. Sybra, Inc.*, 667 F.3d 757, 762–63 (6th Cir. 2012) (applying *McDonnell Douglas* to interference claims). Plaintiff can only "refute the legitimate, nondiscriminatory reason that an employer offers to justify an adverse employment action by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Grace*, 521 F.3d at 670 (internal quotation marks omitted). At this stage, plaintiff must put forth evidence that, taken in a light most favorable to him, could lead a reasonable jury to reject Concentra's proffered explanations. *Davis v. Cintas Corp.*, 717 F.3d 476, 491 (6th Cir. 2013). This he has not done. Defendant's legitimate and nondiscriminatory reasons for firing plaintiff were legion. Plaintiff was, to put it lightly, a difficult employee who did not seem to accept defendant's business philosophies and was vocal about it among his staff and coworkers. This, along with concerns about his work attendance and punctuality—which had real-world consequences for patients at the Livonia center—lack of attendance at mandatory meetings, and his disrespect towards some of his supervisors, gave defendant more than legitimate reasons to fire him. *Id*.

Plaintiff attempts to show that these reasons were merely pretext by pointing to the deposition testimony of Suzy Francoeur, a physician assistant at a different Concentra location.

Her testimony provided that other Concentra employees, including at least one doctor, had failed to pay attention during meetings, or regularly showed up late to work, or spoke out against Concentra policies with which they disagreed, and that these employees suffered no consequences. Therefore, plaintiff argues that defendant's proffered reasons for firing him were insufficient to warrant his firing or did not actually motivate it. *Id*. But undisputed evidence showed that plaintiff was warned or received a PIP about numerous issues, including his disrespectful behavior, his tardiness, and his failure to abide by Concentra's policies, and that he had been given numerous chances to fix his shortcomings, to no avail. And plaintiff can point to no similarly situated employee who was treated differently despite a disciplinary record as extensive as his own. In short, plaintiff has presented no evidence that could raise even an inference that defendant's actions were based on impermissible considerations. Thus, the district court did not err in granting summary judgment on plaintiff's interference-theory claim under the FMLA.

B.

Plaintiff's FMLA retaliation theory fares no better. To establish a prima facie case under the retaliation theory, plaintiff must show that (1) he availed himself of a protected right under the FMLA by notifying Concentra of his intent to take leave, (2) he suffered an adverse employment action, and (3) that there was a causal connection between the exercise of his rights under the FMLA and the adverse employment action. *Edgar*, 443 F.3d at 508. "If the employee satisfies these three requirements, the burden shifts to the employer to proffer a legitimate, nondiscriminatory rationale for discharging the employee." *Id*. As noted above in our discussion of plaintiff's interference-theory claim, plaintiff has failed to show he gave Concentra notice of his intent to take intermittent leave. Again, plaintiff testified that his interactions with Concentra employees about FMLA leave were merely investigatory, and that he did not comply with

Concentra's third-party, FMLA-requesting policy, even though he knew of it. Quite simply, plaintiff never properly notified Concentra of his intent to take leave, and that is fatal to his claim. Instead, and as noted above, defendant offered several valid, nondiscriminatory reasons for plaintiff's firing, and plaintiff has not shown them to be pretextual. *See Grace*, 521 F.3d at 670. The district court correctly granted summary judgment in defendant's favor on plaintiff's FMLA claims.

IV.

Next, we turn to plaintiff's challenge to the district court's grant of summary judgment on his various ADA claims. The district court addressed three theories of relief under the ADA: general discrimination, retaliation, and failure to accommodate. We address each in turn.

The ADA provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). "Where, as here, the plaintiff seeks to establish discrimination through indirect, rather than direct, evidence, we require the plaintiff to establish a prima facie case, followed by the familiar *McDonnell Douglas* burden-shifting." *Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1105 (6th Cir. 2008).

A.

Plaintiff first argues that the district court erred in dismissing his claim of disability discrimination. "A prima facie case of disability discrimination under the ADA requires that a plaintiff show: 1) he or she is disabled; 2) otherwise qualified for the position, with or without reasonable accommodation; 3) suffered an adverse employment decision; 4) the employer knew or had reason to know of the plaintiff's disability; and 5) the position remained open while the

employer sought other applicants or the disabled individual was replaced." *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 703 (6th Cir. 2008) (internal quotation marks omitted). Here, we can assume without deciding that plaintiff established a prima facie case of disability discrimination under this test, because his claim fails once we reach the second and third stage of the burden-shifting framework.

As noted in our analysis of plaintiff's FMLA claims, once the burden shifted to Concentra, it provided numerous nondiscriminatory reasons for his firing. Plaintiff never accepted defendant's business philosophies and was vocal about his discontent in the workplace. When coupled with defendant's concerns about his work attendance and punctuality, lack of attendance at mandatory meetings, and his disrespect towards some of his supervisors, defendant had sufficient reason to fire him. *Davis*, 717 F.3d at 491.

Plaintiff wholly failed to rebut defendant's basis for terminating his employment. Other than temporal proximity and the fact that defendant was aware of his back injury, plaintiff presented no evidence that his firing was related to his disability, let alone because of it. "[T]he law in this circuit is clear that temporal proximity cannot be the sole basis for finding pretext," *Donald*, 667 F.3d at 763, and plaintiff cites no evidence that any similarly situated, nondisabled employee with a disciplinary record as voluminous as his was treated differently. Instead, as aptly put by the district court, "[t]he decision to terminate Dr. Keogh followed his demotion to float physician, a series of oral and written warnings due to his unprofessional behavior and tardiness, and his failure to improve his identified deficiencies." Plaintiff has not shown these reasons to be pretextual, and his claim fails. *See Grace*, 521 F.3d at 670.

B.

Plaintiff's ADA retaliation claim also fails. A prima facie case of retaliation requires evidence that: (1) the plaintiff engaged in legally protected activity under the ADA; (2) the defendant knew of the plaintiff's exercise of that right; (3) the defendant took an employment action against the plaintiff; and (4) the protected activity and the employment action are causally connected. *Rorrer v. City of Stow*, 743 F.3d 1025, 1046 (6th Cir. 2014). Plaintiff must show "but for" causation. *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 321 (6th Cir. 2012) (en banc). The parties' main dispute—and the district court's basis for granting summary judgment on this claim—was the fourth element: causation.

But the district court completely discounted the temporal relationship between plaintiff's alleged ADA-protected activity and his firing. While the district court is correct to note that "the law in this circuit is clear that temporal proximity cannot be the sole basis for finding *pretext*," *Donald*, 667 F.3d at 763 (emphasis added), the court erroneously conflated pretext with the prima facie requirement of causation. At the prima facie stage, "where the temporal proximity between the protected activity and the adverse employment action is acutely near in time, that close proximity is deemed indirect evidence such as to permit an inference of retaliation to arise." *Seeger*, 681 F.3d at 283 (quoting *DiCarlo v. Potter*, 358 F.3d 408, 421 (6th Cir. 2004) (overruled in part on other grounds by *Lewis*, 681 F.3d 312)). Here, given that plaintiff allegedly requested some ADA accommodations in a discussion with Tschirhart only a week or so before being fired, the temporal relationship was sufficiently acute to permit an inference of retaliation. *Id*. (finding such an acute relationship when the plaintiff was fired "three weeks after his reinstatement and less than two months after he first notified [the defendant] of his medical leave"). Thus, the district

court erred in holding that plaintiff failed "to meet the low threshold of proof necessary to establish a prima facie case of retaliatory discharge," because his case lacked causation evidence. *Id.*

Nevertheless, and even assuming that the other elements of plaintiff's prima facie case have been met, given the evidence supporting defendant's legitimate reasons for terminating plaintiff's employment, defendant met its *McDonnell Douglas* step-two burden of showing a nondiscriminatory reason for its decision. Because, as noted throughout this opinion, plaintiff has not shown these reasons to be mere pretext for discrimination, the district court correctly concluded that this claim also fails.

C.

Finally, we turn to plaintiff's failure to accommodate claim. The ADA defines "discriminat[ion] against a qualified individual on the basis of disability" to include "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an . . . employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C § 12112(b)(5)(A). To establish a prima facie case of failure to accommodate, plaintiff must show that: (1) he is disabled within the meaning of the ADA; (2) he is otherwise qualified for the position, with or without reasonable accommodation; (3) his employer knew or had reason to know about his disability; (4) he requested an accommodation; and (5) the employer failed to provide the necessary accommodation. *DiCarlo*, 358 F.3d at 419. As part of this prima facie case, the plaintiff "bears the initial burden of proposing an accommodation and showing that that accommodation is objectively reasonable." *Kleiber v. Honda of Am. Mfg.*, 485 F.3d 862, 870 (6th Cir. 2007).

Plaintiff's two alleged accommodation requests fail on either the fourth or fifth element above. First, on his request for a standing workstation—and assuming he made a formal request—plaintiff admitted that he received this accommodation at the Concentra locations he frequented, and that defendant affirmatively created such a standing workstation for him in one center. Plaintiff's hypothetical concerns about the lack of such standing workstations at centers to which he had not yet ever been assigned, do not constitute defendant's failure to accommodate his request. Thus, plaintiff cannot show that Concentra failed to provide this accommodation. *DiCarlo*, 358 F.3d at 419.

And, despite plaintiff's assertions to the contrary on appeal, the district court correctly noted that plaintiff never actually requested the shorter workday accommodation. Plaintiff testified that, during an argument with Dr. Thomas, he told her "I want to work part time FMLA or I want an accommodation, my legs are giving out after six hours here, and I can't do the full nine, and I've always been one to work the full nine." But then he later admitted that he did not tell Dr. Thomas what accommodations he thought he needed and that he "was just seeking out information at this time." Then plaintiff testified that he spoke with Tschirhart about both FMLA leave and accommodations, but again, he admitted that he was "investigating and ask[ing] Tom Tschirhart about which way to go." While we do not require "magic words" for a request for accommodation to be valid, *see Smith v. Henderson*, 376 F.3d 529, 535–36 (6th Cir. 2004), plaintiff's own testimony shows that no such request was made, and he was still weighing his options. In other words, plaintiff's hemming and hawing left Concentra to "speculate as to the extent of the employee's disability or the employee's need or desire for an accommodation." *Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1042, 1046–47 (6th Cir. 1998). The ADA requires more

of plaintiff than this. *Id.* Thus, the district court correctly granted summary judgment on plaintiff's ADA claims.

V.

We affirm the judgment of the district court.